# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: March 27, 2020

```
*  *  *  *  *  *  *  *  *  *  *  *  *  **
```

| | | |
|---|---|---|
| TERESA SHERBINE, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 17-413V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Pain and |
| AND HUMAN SERVICES, | * | Suffering; Table Injury; Influenza ("Flu") |
| | * | Vaccine; Shoulder Injury Related to Vaccine |
| Respondent. | * | Administration ("SIRVA"). |
| | * | |

```
*  *  *  *  *  *  *  *  *  *  *  *  *  **
```

Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for petitioner.
Sarah Christina Duncan, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

On March 23, 2017, Teresa Sherbine[2] ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq., ("Vaccine Act" or "the Program").[3]   Petitioner alleges that she suffered left shoulder injuries caused by an October 30, 2015 influenza ("flu") vaccination.  Petition at 1-2.  A Ruling on

---

[1] Because this Decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this Decision on the website of the United States Court of Federal Claims, in accordance with the E- Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).

[2] Petitioner filed this case as Teresa Tinley.  On June 21, 2019, the Court granted petitioner's motion to amend the case caption to reflect petitioner's name change to Teresa Sherbine.  Order dated June 21, 2019 (ECF No. 61).

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Entitlement issued on January 31, 2019, in which the undersigned found that petitioner was entitled to compensation.  Ruling on Entitlement ("Ruling") dated Jan. 31, 2019 (ECF No. 48).  The parties now seek a Decision awarding damages to petitioner.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that petitioner is entitled to an award of $70,000.00 for actual pain and suffering and $269.32 for actual unreimbursable expenses.[4]  Petitioner is not entitled to damages for future pain and suffering.

### I.      PROCEDURAL HISTORY

The procedural history from the date the petition was filed through the date of the Ruling on Entitlement ("Ruling") was set forth in the Ruling, and will not be repeated here.  See Ruling dated Jan. 31, 2019 (ECF No. 48).

After the Ruling issued, petitioner filed additional medical records from Somerset Family Practice.  Petitioner's Exhibit ("Pet. Ex.") 12.  From approximately February until October 2019, the parties attempted to resolve damages informally.  On October 7, 2019, petitioner notified the undersigned that the parties had reached an impasse in resolving damages, and proposed that the parties file respective briefs setting out their positions, after which the undersigned could resolve damages.  Pet. Status Report, filed Oct. 7, 2019 (ECF No. 69).  The undersigned held a status conference on October 23, 2019, in which the parties agreed to a briefing schedule.  See order dated Oct. 24, 2019 (ECF No. 70).

On December 9, 2019, the petitioner filed supporting lost wage documentation and her memorandum in support of damages.  Pet. Ex. 13; Pet. Memorandum in Support of Damages ("Pet. Mem."), filed Dec. 9, 2019 (ECF No. 74).  Thereafter, on January 23, 2020, respondent filed his memorandum regarding damages.  Respondent's Memorandum Regarding Damages ("Resp. Mem."), filed Jan. 23, 2020 (ECF No. 75).

On February 12, 2020, the undersigned issued an order finding petitioner likely entitled to some amount of lost wages, but additional documentation was required to determine this amount.  Order dated Feb. 12, 2020, at 6 (ECF No 76).  The Court directed petitioner to file additional documentation and noted that without such additional proof, petitioner would not be entitled to past nor future lost wages.  Id. at 6-7.

On March 13, 2020, in response to the Court's February 12, 2020 Order, "petitioner [] reported that the directors and office personnel she reported to are no longer with the Low

---

[4] The parties have agreed to reimbursement in the amount of $269.32 in past unreimbursed expenses.  See Pet. Memorandum in Support of Damages ("Pet. Mem."), filed Dec. 9, 2019, at 8 (ECF No. 74); Respondent's Memorandum Regarding Damages ("Resp. Mem."), filed Jan. 23, 2020, at 5 (ECF No. 75).  Petitioner is not seeking damages for lost wages.  See Pet. Status Report, filed Mar. 13, 2020, at ¶ 3 (ECF No. 77).

Income Home Energy Assistance Program ('LIHEAP') and, therefore, such evidence as required in the aforementioned Order would be unobtainable." Pet. Status Report, filed Mar. 13, 2020, at ¶ 2 (ECF No. 77). Therefore, petitioner "rescind[ed] her claim for past and future lost wages." Id. at ¶ 3.

The matter is now ripe for adjudication.

## II.    FACTUAL HISTORY

### A. Factual Background Set Forth in the Ruling[5]

Ms. Sherbine was 65 years old when she received the flu vaccine in her left arm at a Rite Aid pharmacy on October 30, 2015. Pet. Ex. 1 at 1-2. She was in good health and had no prior history of pain or injury in either shoulder. See Transcript ("Tr.") 6-7; see generally Pet. Ex. 7 at ¶¶ 1, 9-10, 15-16. Petitioner averred in her affidavit that the injection "immediately hurt," and that the pharmacist told her it would be sore for a couple of days. Pet. Ex. 7 at ¶ 4. Petitioner stated that the pain worsened in November 2015 and by January 2016, the range of motion in her left shoulder had declined. Id. at ¶¶ 6-7. During this time, she used ice packs throughout the day. Id. In February 2016, she was still in pain and realized it was not going to go away on its own. Id. at ¶ 8.

On March 22, 2016, petitioner returned to Rite Aid to seek advice. Pet. Ex. 7 at ¶ 9. A Vaccine Adverse Event Reporting System ("VAERS") report was filed in petitioner's name by Tim Lisberg of Rite Aid. Pet. Ex. 6. The VAERS report stated that petitioner had "pain in upper arm, 'debilitating' according to patient. Pain still present as of 3/22/16, when vaccine given 10/30/15." Id. at 1. Petitioner testified that initially she went to Rite Aid rather than a doctor "[t]o ask for advice. I thought this is where it started, maybe they can direct me, maybe they can tell me what I need to do or tell me if this has happened before to others . . . just to get advice." Tr. 19. Petitioner testified that at Rite Aid she was told her VAERS report would be filed and she was informed of the Program. Id.

On April 6, 2016, petitioner presented to orthopedist Jane Tan, M.D. Pet. Ex. 3 at 1. Petitioner reported that she had a flu shot in October 2015 and afterward had swelling and redness. Id. She reported that since then, she had difficulty with overhead reaching and dropping objects. Id. On examination, she exhibited positive impingement signs under the Neer and Hawkins tests and tenderness over the bicipital groove. Id. Her left arm demonstrated reduced external rotation of 45°, compared to 60° on her uninjured right side. Id. X-rays were taken and found to be normal. Id. Dr. Tan diagnosed petitioner with left rotator cuff syndrome and left biceps tendinitis, administered a cortisone injection to the left subacromial space, and provided petitioner with a physical therapy prescription for use as needed. Id. at 1-2.

---

[5] This history is largely taken the factual history set forth in the Ruling, modified to focus on the issues here. See Ruling dated Jan. 31, 2019, at 3-6 (ECF No. 48).

On May 25, 2016, petitioner was seen by nurse practitioner ("NP") Karen Richard-Reynolds at Eagles Landing Family Practice.  Pet. Ex. 2 at 1.  Petitioner reported that she received a flu shot at Rite Aid in October 2015 and had "severe and constant" pain in her left arm.  Id.  NP Richard-Reynolds diagnosed petitioner with left upper arm pain and provided her with a physical therapy referral.  Id. at 2.

On June 1, 2016, petitioner reported to physical therapist Stevi Wheeler of Benchmark Physical Therapy for an initial evaluation.  Pet. Ex. 4 at 15.  Petitioner reported that she received a flu shot in her left arm and felt something rip in her arm.  Id.  Petitioner reported that she "ha[d] been very inhibited for several months, and had 'dealt with it' for several months until April" when she went to see an orthopedist and received a steroid injection with no changes.  Id. Petitioner reported moderate to severe loss of function, severe stiffness, pain, and weakness, and moderate to severe problems with driving.  Id.  On examination, physical therapist Wheeler found that petitioner's active range of motion was limited to 85° in flexion and 70° in abduction and stated a goal of 180° for both.  Id. at 16.[6]

On June 2, 2016, petitioner reported to physical therapist Wheeler for a second physical therapy session.  Pet. Ex. 4 at 13.  Petitioner reported a pain level of 5/10 and that her arm was better but remained sore when trying to sleep.  Id.  On June 6, 2016, petitioner returned for another physical therapy session.  Id. at 10.  She reported a pain level of 5/10, her pain was better, and she had not had an episode of pain reaching 10/10 recently.  Id.  On June 8, 2016, petitioner attended a fourth physical therapy session.  Id. at 7.  She reported a pain level of 5/10 and that she was slowly getting better.  Id.  On June 30, 2016, after four sessions, petitioner was discharged from physical therapy at her request for financial reasons.  Id. at 4-6.

On June 9, 2016, petitioner was seen by physician assistant ("PA") Miranda Stone at Eagles Landing Family Practice.  Pet. Ex. 2 at 4.  Petitioner reported pain in her left arm for the past eight months following a flu vaccination on October 30, 2015.  Id.  Petitioner believed she was injected in a nerve and had experienced sharp and stabbing pain with constant throbbing.  Id. She stated that physical therapy had not resolved her pain.  Id.  PA Stone diagnosed petitioner with left shoulder strain, directed petitioner to stop physical therapy for two weeks, and referred her for an orthopedic consultation.[7]  Id.

Ms. Sherbine filed an affidavit dated February 8, 2017 in which she stated that prior to the October 30, 2015 vaccination, she was in "good health," walked three miles a day, and did

---

[6] The record states, "Right AROM [Active Range of Motion]."  Pet. Ex. 4 at 16.  However, the reference to the right shoulder appears to be a typo.  The rest of physical therapist Wheeler's initial evaluation record indicates that the evaluation concerned petitioner's left shoulder.  See, e.g., id. ("TTP [tender to palpation] along L upper arm."); id. at 17 ("Patient presents with signs and symptoms that are consistent with: L arm pain."); id. at 15 (noting a diagnosis of "M79.622 Pain in left upper arm" and "M25.512 Pain in left shoulder").

[7] Petitioner did not see an orthopedist after this visit.

water aerobics.  Pet. Ex. 7 at ¶ 1.  She averred that the flu vaccine administered on October 30, 2015 "immediately hurt."  Id. at ¶ 4.  The morning after the vaccine administration, the injection site "was puffy and more red than the previous day.  The area was very sore to the touch."  Id. at ¶ 5.  She described that in November 2015, "the pain in my left arm at the injection site increased to a throbbing pain. . . . It became difficult to sleep. . . . Due to the pain that accompanied trying to find a comfortable position to sleep, I was up and down throughout the night."  Id. at ¶ 6.  By January 2016, "the range of motion of my left arm declined.  If I moved my arm towards my backside or tried to raise it over my head to put on clothes, I had excruciating pain.  It was as if a knife were stabbing into my flesh."  Id. at ¶ 7.

Petitioner further averred that "[s]ince my flu vaccination, I am unable to use my left arm to dress myself.  I cannot use my left arm to help wash my back or lift it high enough to wash my hair."  Pet. Ex. 7 at ¶ 15.  "Simply opening or closing my car door, or latching a seatbelt with my left arm leads to severe pain.  As a whole, I have had to adjust my daily routine in order to avoid the excruciating pain."  Id.  "My entire life changed after the flu vaccine."  Id. at ¶ 16.

At the hearing, petitioner testified about her pre-vaccination health status.  She testified that before the vaccination she never had problems with either shoulder.  Tr. 7.  She further testified that prior to her vaccination,

> I was a very healthy person.  I never had any injuries, [took] no medications, very self-sufficient, very independent woman.  I cut grass, four acres of grass every weekend, cut tree limbs down, cleaned my house, did interior decorating for people, previously had worked in the construction industry, . . . did water aerobics, exercising, walking two, three miles a day, sometimes twice a day, just very active.

Tr. 6-7.

Petitioner testified that she "experienced pain immediately [after vaccination] . . . . [I]t's still sore right here."  Tr. 12.  She testified that at the time of vaccination she had "no insurance other than Medicare" and her sole sources of income were Social Security and income from a seasonal job where she formerly worked for approximately three to five months per year.  Tr. 15-16.  She explained that she considered going to the emergency room due to her shoulder pain but "[o]nly having Medicare, I knew that I would have to pay at least [a] 20 percent copay and it was the money factor."  Tr. 20.  For this reason, she opted to see an orthopedic specialist rather than going to the emergency room.  Id.

She testified that the "cortisone shot [administered by orthopedist Dr. Tan] really didn't do anything that I could tell."  Tr. 22.  She explained that after four physical therapy sessions and two primary care visits, she had ceased seeking formal treatment for her shoulder because "[n]o one seemed to understand about the pain. . . . They wanted to mask it with pain pills. . . . I did not want to take pain pills.  I was wanting to know what was wrong and what we could do to

make it better, and they could not give me that answer." Tr. 23.  She explained that physical therapy had helped some, but she stopped going because she ran out of money for copays and felt the last visit may have reinjured her shoulder.  Id.

At the hearing on July 17, 2018, petitioner testified that while her shoulder was "somewhat better," she continued to have pain.  Tr. 25.  She occasionally takes ibuprofen for throbbing pain.  Id.  Petitioner is still unable to sleep on the side of her injured shoulder.  Tr. 26. Also, she had to be careful about picking up items to avoid dropping them.  Id.

## B.  Medical Records Filed After the Ruling

After the Ruling issued, petitioner filed updated medical records from Somerset Family Practice ("Somerset"), which cover her medical care after she moved to Pennsylvania, from 2017 to 2019.  Pet. Ex. 12.  Generally, these records establish that petitioner has been diagnosed and treated with Barrett's esophagus, thrombocytopenia, elevated liver function tests, and prediabetes.  Id. at 2.

Relevant to her shoulder injury, petitioner was seen at Somerset on December 15, 2017, for complaints of sore throat, cough, and congestion.  Pet. Ex. 12 at 13.  At that visit, there is no reference to shoulder or arm pain.  Id. at 13-14.  She was next seen October 2, 2018, for a new patient visit.  Id. at 8.  At that visit, Dr. Mark Yaros charted, "no overwhelmingly concerning joint pains, severe musculoskeletal symptoms, debility, or increased weakness."  Id.  Of note, petitioner refused recommended vaccines.  Id. at 9.  Dr. Yaros noted, "she has [sic] a prolonged L arm pain after her last Flu vaccine-2014.  She will not accept another vaccine for fear of the prolonge[d] arm pain had in the past."  Id.  There is no reference to current shoulder or arm pain. See id. at 8-9.  The last visit was November 23, 2018, for a checkup.  Id. at 3.  There is no mention of shoulder or arm pain at that visit.  Id. at 3-4.

Records from petitioner's gastroenterologist, Dr. M. Javad Saddat, for care and treatment in 2017 and 2018 are included in the Somerset records.  Dr. Saddat's records show that petitioner has been diagnosed with mild gastritis, upper esophageal stricture, and Barrett's esophagus.  Pet. Ex. 12 at 34-35.  Petitioner has undergone a balloon dilation of her upper esophagus, EGD with biopsy, and colonoscopy.  Id. at 33, 35.  Dr. Saddat's records do not document any complaints by petitioner of shoulder or arm pain.

The records also include an emergency room note dated August 24, 2017, describing petitioner's complaint of vertigo.  Pet. Ex. 12 at 36.  A review of systems documented by Dr. Christine Pluto states "no history of significant joint pain, weakness of muscles, or stiffness."  Id.

## III.   PARTIES' POSITIONS AS TO PAIN AND SUFFERING

Petitioner seeks damages in the amount of $90,000.00 for past and future pain and suffering.  Pet. Mem. at 14.  She asserts that this amount is warranted based on the severity and

duration of her pain as well as the degree of treatment necessary to treat her shoulder injury related to vaccine administration ("SIRVA").  Id. at 10-14.  She attended four[8] physical therapy sessions, had an X-ray of her left shoulder, a cortisone injection, and one appointment with an orthopedic specialist.  Id. at 10.  Prior to her injury, petitioner was very active and performed indoor and outdoor chores, including yard work, cutting four acres of grass, cleaning tree limbs, and house cleaning.  Id. at 10-11.  She especially enjoyed walking and social activities.  Id. at 11.  As a result of her shoulder injury, she had difficulty sleeping, became inactive, and gained weight.  Id.

Petitioner provides a summary of cases where petitioners did not undergo shoulder surgery and were awarded pain and suffering damages ranging from $60,000.00 to $110,000.00.  See Pet. Mem. at 12-13.  Of the cases cited, petitioner suggests that her case is most comparable to Marino,[9] Dirksen,[10] and Bruegging.[11]  Id. at 14.  Petitioner states that in Marino, the Court awarded $75,000.00 to a petitioner who had intense pain for seven months, saw an orthopedist twice, and received one cortisone injection.  Id. at 12.  In Dirksen, the petitioner received $85,000.00, where the injury was described as mild to moderate, but the petitioner had significant pain for eight months and sequelae for four years.  Id. at 13.  And in Bruegging, $90,000.00 was awarded to petitioner who required physical therapy and two steroid injections, and improved after ten months.  Id.

In contrast, respondent asserts that petitioner had a relatively mild clinical course, as evidenced by the fact that she did not seek treatment for more than five months, she had three evaluations, attended four physical therapy sessions, had one steroid injection, and took prescription medication through September 2016.  Resp. Mem. at 7-8.  Respondent also points out that petitioner did not seek treatment after June 2016, and that she did not report continued shoulder pain to her physicians in 2017 or 2018.  Id. at 8.  Based on these facts, respondent argues that $40,500.00 is a reasonable award for pain and suffering.  Id.

---

[8] Petitioner writes in her memorandum that she attended five physical therapy sessions, but the records indicate she attended only four.  Compare Pet. Mem. at 10, with Pet. Ex. 4 at 5.

[9] Marino v. Sec'y of Health & Human Servs., No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).

[10] Dirksen v. Sec'y of Health & Human Servs., No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018).

[11] Bruegging v. Sec'y of Health & Human Servs., No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019).

Respondent cites the Knauss[12] case as the most similar to petitioner's case.  Resp. Mem. at 8.  The petitioner in Knauss was awarded $60,000.00 in pain and suffering damages.  Knauss, 2018 WL 3432906, at *1.  As respondent summarized, the Knauss petitioner did not seek treatment until three months after vaccination, attended more physical therapy than Ms. Sherbine, and had one steroid injection.  Resp. Mem. at 8.  Respondent disagrees that Marino, Dirksen, and Bruegging are similar to petitioner's case, arguing that the petitioners in those cases all had more treatment or compelling circumstantial evidence warranting larger awards for pain and suffering.  Id. at 8-9.  In Ms. Sherbine's case, respondent argues that there is "lack of objective evidence" or "corroborating testimony" to support the award which petitioner seeks. Id. at 9.

## IV.   VACCINE ACT REQUIREMENTS FOR AWARD OF PAIN AND SUFFERING

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).  Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary."  § 15(a)(1)(B).  Petitioner bears the burden of proof with respect to each element of compensation requested.  Brewer v. Sec'y of Health & Human Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  I.D. v. Sec'y of Health & Human Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined using a mathematical formula."); Stansfield v. Sec'y of Health & Human Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation.").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Human Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Human Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering

---

[12] Knauss v. Sec'y of Health & Human Servs., No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018).

awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, the undersigned may also rely on her own experience adjudicating similar claims.[13]  Hodges v. Sec'y of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Human Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Graves, 109 Fed. Cl. at 589-90.  Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Program, and a survey of similar injury claims outside of the Program.  Id. at 595.

Although this case was removed from the Special Processing Unit ("SPU") on September 30, 2019, the undersigned finds statistical data from SIRVA cases resolved in SPU to be informative, as they have an extensive history of informal resolution within the SPU.[14]  As of January 1, 2020, 1,405 SIRVA cases have informally resolved[15] within the SPU since its inception in July 2014.  Of those cases, 817 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[16] Additionally, 567 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

---

[13] From July 2014 until September 2015, the Special Processing Unit ("SPU") was overseen by former Chief Special Master Vowell.  For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to undersigned.

[14] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims' website by keyword and/or by special master.  On the Court's main page, click on "Opinions/Orders" to access the database. All figures included in this Decision are derived from a review of the decisions awarding damages within SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximations.

[15] Additionally, 41 claims alleging SIRVA have been dismissed within the SPU.

[16] There have been 21 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,044.86 to $122,038.99,[17] with the median award at $95,000.00. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $92,500.00,[18] with the median award at $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

In seventeen prior SPU cases, petitioners were awarded compensation for pain and suffering below the amount of the median proffer discussed above. These awards for actual pain and suffering ranged from $60,000.00 to $90,000.00.[19] These cases included injuries with a

---

[17] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 21 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[18] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[19] These cases are: Dagen v. Sec'y of Health & Human Servs., No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursable expenses); Goring v. Sec'y of Health & Human Servs., No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 28, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); Lucarelli v. Sec'y of Health & Human Servs., No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); Kent v. Sec'y of Health & Human Servs., No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); Capasso v. Sec'y Health & Human Servs., No. 17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and
(. . . continued)

"good" prognosis, albeit in some instances with some residual pain.  Petitioners in these cases had mild to moderate limitations in range of motion and MRI imaging likewise showed evidence of mild to moderate pathology such as tendinosis and bursitis.  The duration of injury ranged from six to twenty-nine months and, on average, these petitioners experienced approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months.  However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less.  Slightly less than one-half were administered one to two cortisone injections.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery. The petitioners in Schandel, Garrett, and Weber attended physical therapy from almost four to five months, but most of the physical therapy in Weber focused on conditions unrelated to the petitioner's SIRVA.  Several of these cases (Goring, Lucarelli, Kent, Knauss, Marino, Kim, and Dirksen) included a delay in seeking treatment.  These delays ranged from about forty-two days in Kim to over six months in Marino.

Additionally, in eight prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering above the median proffered SIRVA award.  These awards have ranged

---

suffering and $190.00 for actual unreimbursable expenses); Schandel v. Sec'y of Health & Human Servs., No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); Bruegging, 2019 WL 2620957 (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); Pruett v. Sec'y of Health & Human Servs., No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); Bordelon v. Sec'y of Health & Human Servs., No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); Weber v. Sec'y of Health & Human Servs., No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); Garrett v. Sec'y of Health & Human Servs., No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); Attig v. Sec'y of Health & Human Servs., No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); Dirksen, 2018 WL 6293201 (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); Kim v. Sec'y of Health & Human Servs., No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); Knauss, 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); Marino, 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); Desrosiers v. Sec'y of Health & Human Servs., No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

from $110,000.00 to $160,000.00.[20]  Like those in the preceding group, prognosis was "good." However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Seven out of eight underwent some form of shoulder surgery while the fifth (Cooper) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In seven out of eight cases, MRI imaging showed possible evidence of partial tearing.[21]  No MRI study was performed in the Cooper case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately. Time to first treatment ranged from five days to forty-five days.  Duration of physical therapy ranged from one to twenty-eight months and six out of the eight had cortisone injections.

---

[20] These cases are: Nute v. Sec'y of Health & Human Servs., No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); Kelley v. Sec'y of Health & Human Servs., No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); Wallace v. Sec'y of Health & Human Servs., No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); Reed v. Sec'y of Health & Human Servs., No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); Knudson v. Sec'y of Health & Human Servs., No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); Cooper v. Sec'y of Health & Human Servs., No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); Dobbins v. Sec'y of Health & Human Servs., No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); Collado v. Sec'y of Health & Human Servs., No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[21] In Reed, MRI showed edema in the infraspintaus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In Dobbins, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In Collado, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus.  In Knudson, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

In three prior SPU SIRVA cases, the petitioner was awarded compensation for both past and future pain and suffering.[22]  In two of those cases (Hooper and Binette), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The petitioner in Hooper underwent surgery while the petitioner in Binette was deemed to not be a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in Hooper), medical opinions indicated that their disability would be permanent.

## V.    APPROPRIATE COMPENSATION IN THIS SIRVA CASE

In this case, awareness of the injury is not in dispute.  The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury.  Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

The medical records establish that petitioner had immediate pain on receipt of the vaccine on October 30, 2015, and that she had pain at night, difficulty sleeping, and weakness.  Her pain worsened in November and in January 2016, she had decreased range of motion.  On March 22, 2016, she reported debilitating pain.  When she saw Dr. Tan on April 6, 2016, petitioner reported difficulty reaching overhead, limited range of motion, and she demonstrated impingement symptoms.  She required a cortisone injection for treatment.  On May 25, 2016, petitioner described her pain as "severe and constant."  When seen by a physical therapist on June 1, 2016, petitioner had moderate to severe loss of function, severe stiffness, pain, weakness, and difficulty driving.  Her range of motion was significantly reduced.  She had severe difficulties with activities of daily living.  One of the barriers to progress noted by the physical therapist was the severity of petitioner's pain.  Petitioner attended four physical therapy sessions.  On June 6, 2016, she reported pain 5/10, with an episode of severe pain at 10/10.  On June 9, 2016, petitioner reported "sharp and stabbing" pain with "constant throbbing."  She was unable to continue physical therapy due to financial concerns and the costs of copays.

Petitioner did not seek medical treatment for her shoulder after June 2016.  Over two years later, on October 2, 2018, Dr. Yaros documented that petitioner refused recommended vaccines because of prolonged arm pain she had experienced after her previous flu vaccine.  Other than Dr. Yaros' note, there was no reference to shoulder pain in petitioner's 2017 and 2018 medical records.

---

[22] These cases are: Dhanoa v. Sec'y of Health & Human Servs., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); Binette v. Sec'y of Health & Human Servs., No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); Hooper v. Sec'y of Health & Human Servs., No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

The medical records establish that petitioner suffered a moderately severe SIRVA injury for approximately eight months, with moderate pain that was severe with certain movements and significantly decreased range of motion.  Other than petitioner's testimony, there is no evidence that she continued to experience severe levels of pain beyond June 2016.  As previously held by the Federal Circuit, it is appropriate for a special master to give greater weight to evidence contained in medical records created closer in time to the vaccination.  Curcuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Medical records are the most reliable evidence about a petitioner's medical condition and the effect it has on daily life.  Shapiro v. Sec'y of Health & Human Servs., 101 Fed. Cl. 532, 537-38 (2011) ("There is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")  The paucity of relevant medical records in this case leaves the valuation of petitioner's pain and suffering challenging.  See, e.g., Marino, 2018 WL 2224736, at *8.

The undersigned has reviewed all of the cases cited by both petitioner and respondent to support their respective positions on the appropriate amount of an award for pain and suffering.  Each case is very fact specific and no single decision or award of compensation necessarily accounts for the specific circumstances in this case.  The Knauss, Garrett, and Marino cases provide a frame of reference for damages here.

For example, the severity and duration of petitioner's pain and suffering is similar to that suffered by the petitioner in Garrett, who was awarded $70,000.00 for pain and suffering.  Garrett, 2019 WL 2462953, *1.  In Garrett, the medical records established that petitioner had a moderately severe SIRVA for six months, with sharp and stabbing pain that worsened with movement.  Id. at *8.  However, in Garrett, petitioner's pain at rest was mild or non-existent, while Ms. Sherbine described a period of constant pain.  Also, Ms. Sherbine had extreme pain, rated 10/10, while in Garrett, the petitioner's records documented pain at the milder end of the pain scale.  Further, in Garrett, the petitioner had good range of motion throughout his injury, but due to his SIRVA, he was unable to play basketball most, if not all, of his junior year of high school.  Id. at *8.  The fact that he was unable to play high school basketball was a factor that increased the value of his pain and suffering award.  Id. at *8, *10.

Ms. Sherbine's pain somewhat resembles that of the petitioner in Marino, who was awarded $75,000.00, but there is a significant difference in the duration of pain.  Marino, 2018 WL 2224736, at *8-9.  In Marino, the petitioner had documented pain and limitations that continued for two years after vaccination.  Id. at *8.  Here, there are no medical records to substantiate that petitioner had severe pain after June 2016.

There are other factors that make this case similar to Knauss, where petitioner was awarded $60,000.00.  Knauss, 2018 WL 3432906, at *1.  Like Ms. Sherbine, the petitioner in Knauss delayed seeking treatment for his injury, but then he had three months of continuous treatment and attended twenty-three physical therapy sessions.  Additionally, Mr. Knauss had a cortisone injection approximately one year after vaccination.  Id. at *4.  Ms. Sherbine's pain levels exceeded those experienced by Mr. Knauss, who cited pain levels of 1/10.  Also, Ms. Sherbine's range of motion limitations were more pronounced.

The evidence here does not support a claim for future pain and suffering. While at the time of the hearing, petitioner testified that she is unable to sleep on her injured arm, and must be careful in picking up items to avoid dropping them, she did not complain of ongoing pain. Further, petitioner's medical records do not evidence treatment since June 2016, and no health care provider has opined that the petitioner has a permanent injury.

A petitioner who seeks more medical care has not necessarily experienced a greater degree of suffering than one who seeks less care. Individuals have differing levels of pain tolerance and different thresholds for seeking medical care and treatment. However, the undersigned is required to decide this case based on the evidence in the record. A petitioner who has sought more medical care will have more contemporaneous medical records documenting his or her pain and suffering. In this case, there is little contemporaneous documentation demonstrating the condition of petitioner's shoulder over time, the level of pain that she experienced, and the effect the pain and symptoms had on her daily life. Nevertheless, the undersigned recognizes that petitioner suffered a painful injury that affected her life in many aspects and caused suffering and distress.

Based on a review of the entire record and consideration of the facts and circumstances presented here, and the other cases cited by the parties, the undersigned finds that $70,000.00 is an appropriate award for petitioner's actual pain and suffering.

## VI.    CONCLUSION

In light of all of the above, and in view of the submitted evidence, including the medical records, affidavits, credible witness testimony, and Ruling, **the undersigned finds that $70,000.00 represents an appropriate amount of compensation for petitioner's actual pain and suffering.**

**In addition, the undersigned finds that petitioner is entitled to compensation for $269.32 in past unreimbursed medical expenses.**

**The undersigned awards petitioner a lump sum payment of $70,269.32 in the form of a check made payable to petitioner, Teresa Sherbine.** This amount represents compensation for all damages that are available under §15(a).

The clerk of court is directed to enter judgment in accordance with this decision.[23]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

---

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.